*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DANIELLE KRISTY BARJAS,

       Plaintiff-Appellant,

v

DONALD ALLEN MILLS,

       Defendant-Appellee.

UNPUBLISHED
August 11, 2022

No. 360348
Oakland Circuit Court
Family Division
LC No. 2014-818055-DS

Before: RIORDAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

In this custody dispute, plaintiff appeals as of right the trial court's order granting the parties' joint legal custody over their minor child, TM. Plaintiff contends on appeal that the trial court abused its discretion by awarding the parties joint legal custody because it made findings against the great weight of the evidence in adopting the referee's conclusions that (1) proper cause or a change in circumstances sufficient to modify custody existed, (2) joint legal custody was in TM's best interests, and (3) the parties were able to cooperate and reach agreements necessary for joint legal custody. Plaintiff also argues that the trial court further erred by denying her objection to the referee's joint-custody recommendation without holding an evidentiary hearing. We affirm.

## I. BACKGROUND

Plaintiff was initially awarded sole legal and physical custody over TM following a 2014 default judgment against defendant. At that time, plaintiff lived with TM in Michigan, and defendant, who lived in Colorado, was largely absent from her life. In 2015, defendant moved back to Michigan in an effort to be closer to and more involved with TM. Defendant began exercising parenting time with TM and assisted in her homeschooling, subject to plaintiff's restrictions. In 2020, defendant purchased a new home with suitable accommodations for TM and has since been allowed overnight visits. Over these years, the parties have disagreed on various aspects of TM's upbringing, particularly on the issues of religion, education, and medical treatment. In particular, the parties disagreed over TM's vaccinations and whether TM should be homeschooled or enrolled in public school. Plaintiff is a practicing Jehovah's Witness and has

-1-

raised TM accordingly. Defendant, however, is not religious, and has disparaged certain aspects of plaintiff's beliefs. Moreover, plaintiff began restricting defendant's contact with TM purportedly because defendant refused to stop being with TM when she was naked. Defendant assisted TM with bathing, dressing, and toileting. Plaintiff claimed it was inappropriate for defendant to continue such behavior at TM's current age, while defendant countered that he never did anything improper. No misconduct was ever established and the parties eventually resolved this dispute.

In June 2021, defendant moved for a modification of custody from the trial court's 2014 judgment. Defendant also requested modification to his parenting time, both in his motion to change custody and in a separately-filed motion to change parenting time. He included two complaints against plaintiff alleging she failed to provide him reasonable parenting time with TM. Defendant did not appear at an initially scheduled hearing, and the trial court entered an interim order dismissing both motions without prejudice. Defendant then moved again to modify custody and for specific parenting time. He claimed that proper cause or a change of circumstances necessary to modify custody existed because he was now living in Michigan with suitable housing for TM, had regularly exercised parenting time since his return, and currently had a great relationship with TM. As for his request for specific parenting time, defendant claimed that plaintiff had unilateral control over his time with TM but was failing to facilitate and unwilling to promote a relationship between them.

The trial court entered a stipulated order granting defendant specific, regular parenting time and referring the custody issue for a recommendation from the Friend of the Court (FOC). The FOC recommended against joint legal custody. Defendant then filed an objection to the FOC recommendation and requested an evidentiary hearing on the custody issue. The trial court referred the case for a referee hearing, which occurred on December 3, 2021.

Thereafter, the referee recommended granting defendant's request for joint legal custody and directing the parents to participate in the co-parenting program. The referee first concluded that defendant had met his burden to show proper cause or a change in circumstances sufficient to warrant a change in custody. Next, the referee concluded that TM had an established custodial environment with both parents, defendant's request for joint legal custody would not alter those established custodial environments, and, therefore, defendant had the burden to show by a preponderance of the evidence that his requested modification was in TM's best interests. On this issue, the referee concluded that defendant met his burden and that it was in TM's best interest for the parties to share joint legal custody. The referee also concluded that, despite the parties' disagreements, they were able to sufficiently cooperate and agree on issues concerning TM's upbringing. The referee further reasoned that plaintiff's opposition to joint legal custody appeared to be more about her desire for control over TM than any legitimate concerns about the parties' ability to work together to make decisions in TM's best interest.

Plaintiff obtained new counsel and filed an objection to the referee's recommendation for joint legal custody. She reiterated that the parties could not agree on essential matters relating to legal custody, including: (1) TM being homeschooled, (2) TM being raised as a Jehovah's Witness, (3) defendant being able to respect and not disparage their religion, (4) TM's timeline for receiving vaccinations, (4) whether defendant should be present for TM's medical appointments, and (5) the "age at which certain acts of self-directed grooming should be permitted." Plaintiff argued that

the referee erred in her determinations on proper cause or a change in circumstances, TM's custodial environment, and TM's best interests. Accordingly, plaintiff requested that the court hold another evidentiary hearing on the custody issue and ultimately order (1) the continuation of sole legal custody with plaintiff, (2) restore plaintiff's control over who teaches TM particular school subjects, and (3) direct defendant to refrain from denigrating or misinforming TM about their religion.

The trial court heard plaintiff's objection on February 9, 2022, and determined that it lacked the specificity required under MCR 3.215(E)(4). It also concluded that the referee's recommendation should be adopted because, while the parties disliked each other, they should be able to set aside their differences and work together (or at least civilly compromise) given their shared love for TM. The court denied plaintiff's objection and adopted the referee's recommendation granting defendant's request for joint legal custody and ordered the parties to participate in co-parenting classes. It further ordered neither party to disparage the other nor their beliefs in TM's presence, and directed defendant to refrain from being in a room while TM was naked. This appeal followed.

## II. STANDARDS OF REVIEW

A trial court's order concerning child custody " 'shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue.' " *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010), quoting MCL 722.28.

> In the context of child custody cases, there are findings of ultimate facts, i.e., a finding regarding each factor, and there are findings of ordinary or evidentiary facts. The great weight of the evidence standard applies to all findings of fact. [*Fletcher v Fletcher*, 447 Mich 871, 879; 526 NW2d 889 (1994).]

Under this standard, "a reviewing court should not substitute its judgment on questions of fact unless the factual determination clearly preponderate[s] in the opposite direction." *Pierron*, 486 Mich at 85 (quotation marks and citation omitted; alteration in original). Furthermore, this Court defers to the trial court's credibility determinations. *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011).

A trial court's discretionary rulings in a custody dispute are reviewed for a palpable abuse of discretion, see MCL 722.28, which occurs "when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008). And " '[a] trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law.' " *Vodvarka v Grasmeyer*, 259 Mich App 499, 508; 675 NW2d 847 (2003), quoting *Phillips v Jordan*, 241 Mich App 17, 20; 614 NW2d 183 (2000).

III. ANALYSIS

A. PROPER CAUSE OR CHANGE IN CIRCUMSTANCES TO MODIFY CUSTODY

Plaintiff first argues that the trial court abused its discretion in awarding the parties joint legal custody because the lower-court finding that proper cause or a change in circumstances sufficient to modify custody existed was made against the great weight of the evidence. We disagree.

To modify an existing custody order, the movant must first prove by a preponderance of evidence either proper cause or a change in circumstances warranting such a modification. See *Vodvarka*, 259 Mich App at 508-509; see also MCL 722.27(1)(c). This showing is required before a court can reevaluate the statutory best-interest factors. *Vodvarka*, 259 Mich App at 508-509. This Court has defined proper cause as "one or more appropriate grounds that have or could have a significant effect on the child's life to the extent that a reevaluation of the child's custodial situation should be undertaken." *Id*. at 511. Such grounds "should be relevant to at least one of the twelve statutory best[-]interest factors, and must be of such a magnitude to have a significant effect on the child's well[]being." *Id*. at 512.

Alternatively, a change in circumstances exists when, "since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a *significant* effect on the child's well[]being, have materially changed." *Id*. at 513.

> [N]ot just any change will suffice, for over time there will always be some changes in a child's environment, behavior, and well[]being. Instead, the evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child. [*Id*. at 513-514.]

As with proper cause, courts should evaluate the relevance of the facts to this determination as "being gauged by the statutory best[-]interest factors." *Id*. at 514.

Plaintiff argues that that the referee's finding on proper cause or a change in circumstances, adopted by the trial court, "was not supported by the great weight of the evidence[1]" because the referee relied on "stale" information. Plaintiff notes that defendant's move to Michigan and increased involvement in TM's life occurred six years before his motion to modify custody. She also notes that the parties had a long-established routine for the past several years in which defendant was permitted significant parenting time and plaintiff retained key decision-making authority with sole legal custody. Plaintiff describes TM as thriving under this arrangement. Therefore, according to plaintiff, "no proof [was] offered to show that anything has changed for the child or that she somehow needed her father to be more involved in her life to offset some harm

---

[1] Despite this phrasing used by plaintiff, the proper inquiry here is not whether the trial court's findings were supported by the great weight of the evidence, but rather whether such findings were made *against* the great weight of the evidence. See *Pierron*, 486 Mich at 85.

or missed opportunity caused by the current custodial arrangement." Plaintiff claims that there was no sufficient change from after defendant's move to Michigan, nor even since the initial custody determination in 2014. She also asserts that defendant's modification request was simply based on his unilateral desire for joint legal custody rather than any need for such an arrangement.

Plaintiff further explains that the rationale behind requiring a proof of proper cause or a change in circumstances is to promote and protect the child's stability. In plaintiff's view, "changing custody [in this case] does not promote stability, it encourages instability." Plaintiff lists numerous facts purportedly supporting her argument, including: (1) TM was doing well with her current schooling and engaged in the Jehovah's Witness religion; (2) plaintiff did mostly vaccinate TM apart from the COVID-19 vaccine, which she was willing to consider at a later time; (3) the parties continued to disagree on decisions regarding TM's religion, education, and medical treatment, apparently causing TM distress; (4) despite defendant's apparent willingness to TM being raised as a Jehovah's Witness, he admitted questioning plaintiff's religious teachings and telling her that she was raising TM to be a sycophant; and (5) defendant was disrespectful to, or disinterested in, the opinions of others in TM's life, causing confusion for TM.

We conclude that the lower court's finding on proper cause and a change in circumstances is adequately supported by the record and was not against the great weight of the evidence. The record clearly establishes that after the 2014 default judgment and initial custody determination, defendant moved back to Michigan to be near TM and was significantly more involved in her life, albeit subject to plaintiff's restrictions. Both parties acknowledged the substantial changes in their arrangement, with defendant initially living in a different state and having virtually no contact with plaintiff or TM. By the time defendant moved to change custody, however, he was living near TM with suitable housing, had been engaging in regular parenting time, had a strong relationship with TM, and was intimately involved in her homeschooling, albeit without any decision-making authority.

The referee's recommendation explicitly connected these facts to two best-interest factors. *Vodvarka*, 259 Mich App at 512. Defendant's proximity to and increased involvement with TM implicated the actual love, affection, and emotional ties between the two as well as defendant's capacity to give TM love, affection, and guidance, and to assist in her education. See MCL 722.23(a) and (b). In other words, defendant's move and increased involvement in TM's life was of "such magnitude [as] to have a significant effect on" her wellbeing. *Vodvarka*, 259 Mich App at 512. The difference between an absent father living across the country and one close by who is able to visit regularly and assist with education and other vital childrearing endeavors is no small matter.

Defendant cites to *Sinicropi v Mazurek*, 273 Mich App 149; 729 NW2d 256 (2006), which, while not directly on point, further supports the referee's finding. In *Sinicropi*, this Court determined that one custodial parent's 89-mile move away from the other custodial parent was a sufficient change in circumstances to warrant modification of custody, particularly because it would have changed the child's living environment and schooling. *Sinicropi*, 273 Mich App at 178-179. Though *Sinicropi* involved a parent and the child moving *away* from the other parent, rather than a parent moving *closer* to the child and other parent, as occurred here, there were still significant changes to TM's living environment resulting from defendant's move, making *Sinicropi* analogous. Notably, when defendant initially moved to modify custody, TM began

spending significant time with him and he engaged with her as a father figure—things he did not and could not do when he resided in Colorado. Finally, the fact that defendant waited numerous years after his move and initially-increased involvement in TM's life before requesting any custody modification is irrelevant when the question to be answered with regard to changed circumstances is whether there has been a change since entry of the last custody order in 2014. Thus, the trial court did not err in adopting the referee's recommendation that defendant had proven that there was proper cause and a change of circumstances to warrant modifying legal custody.

## B. THE CHILD'S BEST INTERESTS

Plaintiff next argues that the trial court abused its discretion and made findings against the great weight of the evidence by finding that a change to joint legal custody was in TM's best interests. We disagree.

"Once a party has met the initial burden of showing a change in circumstances or proper cause to revisit the custody order, the next step is for the circuit court to determine the applicable burden of proof for the custody hearing." *Dailey v Kloenhamer*, 291 Mich App 660, 666-667; 811 NW2d 501 (2011), citing MCL 722.27(1)(c). When a proposed modification alters a child's existing custodial environment, the movant must show by clear and convincing evidence that the requested change would be in the child's best interests under the factors provided by MCL 722.23. See *Pierron*, 486 Mich at 89-90; see also MCL 722.26a(1)(a); MCL 722.27(1)(c). Otherwise, the burden of proof is a preponderance of the evidence. *Pierron*, 486 Mich at 89-90. "Generally, the trial court must consider and explicitly state its findings and conclusions regarding each [best-interest] factor . . . ." *Riemer v Johnson*, 311 Mich App 632, 641; 876 NW2d 279 (2015) (quotation marks and citation omitted). Under MCL 722.23, The best-interest factors are:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

-6-

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

Plaintiff does not specifically challenge the lower court findings that TM had an established custodial environment with both parents or that the applicable burden of proof was a preponderance of the evidence. Instead, she argues that the lower court erred in its analysis of factors (b), (d), (h), and (j).

## 1. FACTOR (b)

Plaintiff claims that the referee improperly found factor (b) only slightly favored her. She asserts that this factor clearly fell in her favor because of defendant's consistent issues with TM being raised as a Jehovah's Witness and the parties' disputes over education. Although acknowledging that both parents are able and willing to provide TM love and guidance, plaintiff asserts that defendant, based on his actions, was unwilling to continue TM's existing educational and religious upbringing, despite his "hollow promises" otherwise.[2] According to plaintiff, the record shows that, under this factor, TM was at "risk of having her whole world cast into turmoil by . . . [d]efendant if he tries to change her religion, change her schooling, or attack her core belief system—yet he regularly threatens to do just that."

In analyzing factor (b), the referee explicitly acknowledged the parties' disagreement on religion and education and defendant's prior inappropriate statements to TM. But the referee apparently credited defendant's testimonial assurances that he would not seek to change TM's existing religion or schooling. The trial court also recognized that both parties significantly participated in TM's homeschooling and displayed equal love and affection toward her. Given the totality of the record, it was not against the great weight of the evidence to conclude that this factor only slightly favored plaintiff.

---

[2] To the extent that plaintiff repeatedly argues or implies that defendant was either lying or being disingenuous with various aspects of his testimony below, this Court defers to the lower "court's credibility determinations given its superior position to make these judgments." *Shann*, 293 Mich App at 305.

## 2. FACTOR (d)

Plaintiff next claims that the referee improperly found factor (d) weighed equally between the parties because it should have clearly favored her. She notes that TM has successfully lived with her since birth in a stable and satisfactory environment. In her view, no identifiable reason existed to alter this arrangement aside from defendant's unilateral desire for more input in parenting decisions. Indeed, despite plaintiff's efforts to keep defendant involved in TM's life since his return to Michigan, he continuously undermined plaintiff by disparaging their Jehovah's Witness faith, calling her stupid in front of TM,[3] and refusing to engage with her husband concerning TM's wellbeing.

We acknowledge that TM lived solely with plaintiff for the majority of her life without any concern regarding the stability of that environment. But, after securing new housing in 2020, defendant has been able to exercise overnight parenting time with TM on various weekdays and alternating weekends pursuant to the parties' August 2021 stipulated order. The referee determined both parents' current homes were suitable and sufficiently stable. TM was spending significant time with both parents by the time of the referee's recommendation. Therefore, although plaintiff's more prominent and long-standing role in TM's life compared to defendant could have justified favoring her on this factor, it was not against the great weight of the evidence to weigh it equally between the parties.

## 3. FACTOR (h)

Concerning factor (h), plaintiff asserts that she should have been favored under this factor because TM's successful school, social, and community record were established while she had sole legal and physical custody of TM. In fact, both parties confirmed TM was doing well in school and thriving in her community free of any behavioral or disciplinary issues.

As with factor (b), the referee acknowledged the parties' disputes on education, particularly concerning certain curriculum that might conflict with plaintiff's religious beliefs and defendant's alleged preference for public schooling. But the referee nevertheless stated that there did not seem to be any continuing, significant dispute between the parties on education. Given defendant's assurance that he would not change TM's existing educational program and the referee's superior ability to determine credibility, this conclusion is adequately supported by the record. Although plaintiff is correct that TM appears well-adjusted and has been doing well while under her sole custody, plaintiff ignores defendant's contributions to TM's homeschooling and his growing involvement in her life. Defendant taught TM science, and later math, and he regularly promoted fun and engaging opportunities for her. Given these facts, it was not against the great weight of the evidence to conclude that this factor weighed equally between the parties.

---

[3] Plaintiff testified that defendant told her that she was "stupid" while they were arguing about religion, but otherwise informed her that he thought she was "smart." Plaintiff then testified that their disagreements regarding religion occurred with TM present "ma[n]y times[;]" however, it is unclear whether defendant's insult occurred in front of TM. Going forward, the trial court ordered the parties not disparage each other or their beliefs in TM's presence.

## 4. FACTOR (j)

Plaintiff claims that the referee improperly found factor (j) to slightly favor defendant because she was willing to facilitate and encourage a close and continuing relationship between TM and defendant, but he was not willing to do the same for her.

In analyzing factor (j), the referee correctly recognized that both parents have issues trusting one another and, therefore, facilitating and encouraging a relationship between TM and the other parent. Defendant disparaged plaintiff and TM's religion, while plaintiff called defendant an idiot, "shared inappropriate information with" TM, and restricted defendant's contact with TM for various reasons. Defendant nevertheless encouraged TM to make holiday gifts for plaintiff and to show plaintiff their completed projects. And although not explicitly stated, the referee's preference for defendant on this factor could reasonably have been based on defendant's assurances that he was amenable to plaintiff's wishes concerning TM's existing religion and educational program, while plaintiff seemingly did not want to allow defendant any meaningful input on critical decisions regarding TM's upbringing. Thus, despite plaintiff's argument that she encouraged defendant to have additional parenting time and allowed him to opine on important parenting decisions, the record shows that she largely dismissed defendant's concerns and opinions when they disagreed and that she was generally unwilling to grant defendant any substantive decision-making authority. On this record, it was not against the great weight of the evidence for the referee to find that this factor slightly favored defendant.

## C. JOINT CUSTODY

Plaintiff asserts that the trial court further abused its discretion in awarding the parties joint legal custody because the lower-court finding that the parties were able to agree on key components of TM's upbringing was made against the great weight of the evidence. We disagree.

When considering joint custody, "the court must consider the general level of cooperation and agreement between the parties . . . ." *Dailey*, 291 Mich App at 667 (quotation marks and citation omitted); see also MCL 722.26a(1)(a)-(b) (In addition to the statutory best-interest factors, a court shall consider "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child.").

Plaintiff likens the instant case to *Dailey* in which this Court affirmed the lower court's modification from joint to sole legal custody, in part, because the parties could no longer agree on essential issues concerning their child's wellbeing. *Dailey*, 291 Mich App at 661-664, 667-669. Plaintiff insists that the instant facts actually show more discord between the parties than those in *Dailey*. According to plaintiff, the record showed that the parties did not work well together and could not function as a decision-making unit because they fought constantly and because defendant called her stupid even in front of TM.[4] In plaintiff's view, defendant refused to negotiate in good faith, evinced by his apparent agreement for TM to be raised as a Jehovah's Witness while continuously undermining her religious beliefs. Given the parties continued disagreements on

---

[4] See footnote 3.

essential issues concerning TM's wellbeing[5] and their generally strained relationship, plaintiff argues that joint legal custody would actually have the opposite of its intended goal to create a safe and disruption-free environment for TM.

We first acknowledge that the record does contain evidence of continued disagreements on certain issues. Specifically, defendant "questions" plaintiff's religion and has made disparaging comments regarding plaintiff's beliefs in front of TM. Defendant would also apparently like to teach TM evolution and prefer her to enroll in public school, while plaintiff disagrees. Finally, the parties still cannot fully agree on TM's medical care, specifically her continued lack of vaccination against COVID-19. But notwithstanding these disagreements, defendant explicitly testified that, if granted joint legal custody, he would not interfere with TM's religious upbringing or current educational program. Although plaintiff contends defendant's testimonial concessions on the topics of homeschooling TM and raising her as a Jehovah's Witness were disingenuous, we defer to the lower court's superior ability to weigh the credibility of the witnesses that testified before it. *Shann*, 293 Mich App at 305.

Furthermore, the referee recognized that the parties were able to agree on certain issues. For example, although plaintiff was apparently wholly against vaccination, defendant's concerns persuaded her to adopt a delayed vaccination schedule for TM. Similarly, though not a key component of joint custody decision-making, defendant also acceded to plaintiff's concerns about TM's position in his car once provided with supporting information. And defendant's continued involvement in TM's homeschooling, with no issues identified since his earlier attempts to teach TM evolution in first grade, likewise evinces a willingness and ability of the parties to work together in TM's best interests as does the parties' agreement on a stipulated order regarding parenting time.

In contrast, the child's wellbeing in *Dailey* was relegated as a secondary matter to the parents' documentation of their actions and disagreements, rendering them unable to operate jointly in raising their child.[6] *Dailey*, 291 Mich App at 668-669. In this case, however, plaintiff

---

[5] Plaintiff identifies several areas of disagreement, including religion, education, medical care, and appropriate social boundaries. We have already addressed the first two areas and the trial court's order addressed the issue of social boundaries. As to the medical issues, only the COVID vaccine remained and defendant's absence from TM's medical appointments because "he makes [plaintiff] uncomfortable" as "[h]e is not that nice to [plaintiff]." Although plaintiff had "tried to separate [herself] from the situation to better [TM] because she does love him so much," she just did not "want to be around it" and "would rather . . . just handle [TM's] appointments." Even so, plaintiff always kept defendant informed.

[6] *Dailey* is also procedurally distinct. *Dailey* required this Court to review the lower court's finding that the parties *could not* agree on key aspects of joint legal custody. *Dailey*, 291 Mich App at 668-669. Here, in contrast, we are reviewing the lower court's finding that the parties *were able* to agree on such issues. Given the high standards of review in custody cases, this distinction is important.

and defendant have still been able to come together on certain issues, and both clearly seem to want what is best for TM notwithstanding their disagreements. In fact, despite their earlier dispute concerning evolution, the parties have continuously worked together on TM's homeschooling education. And, as just discussed, the parties can agree (or at least compromise) on numerous other issues, including TM's vaccination schedule and car safety. Also, notable here are defendant's explicit concessions to homeschooling TM and allowing her to be raised as a Jehovah's Witness, even if granted joint legal custody. Finally, unlike *Dailey*, where only four of the best-interest factors favored the defendant and not solely favored the plaintiff, the parties in this case are much more equally weighted.

Because the record established that the parties were able to agree and work together on certain issues, the referee's conclusion that the parties could sufficiently cooperate and agree as necessary for joint legal custody was not against the great weight of the evidence. And given our similar conclusions concerning proper cause or a change in circumstances and TM's best interests, the trial court also did not abuse its discretion in awarding the parties joint legal custody.

### D. FAILURE TO HOLD AN EVIDENTIARY HEARING

Lastly, plaintiff argues that the trial court erred by denying her objection to the referee's joint-custody recommendation without holding an evidentiary hearing. We disagree.

Generally, a party is entitled to a de novo hearing before the trial court when filing a valid and timely objection to a referee's recommendations. See MCL 552.507(4) ("The court shall hold a de novo hearing on any matter that has been the subject of a referee hearing, upon the written request of either party or upon motion of the court. The request of a party shall be made within 21 days after the recommendation of the referee is made available to that party."); MCR 3.215(E)(4). Specific to child custody proceedings, MCR 3.215(E)(4) provides:

> A party may obtain a judicial hearing on any matter that has been the subject of a referee hearing and that resulted in a statement of findings and a recommended order by filing a written objection and notice of hearing within 21 days after the referee's recommendation for an order is served on the attorneys for the parties, or the parties if they are not represented by counsel. The objection must include a clear and concise statement of the specific findings or application of law to which an objection is made. Objections regarding the accuracy or completeness of the recommendation must state with specificity the inaccuracy or omission.

According to plaintiff, the trial court erred by dismissing her objection when it cut off plaintiff's counsel at the objection hearing and took no additional testimony. She claims that (1) the court was obligated under MCR 3.215(E) to allow additional evidence at a de novo hearing, (2) such an opportunity could have altered the outcome by allowing her to establish defendant's promises to support TM's religion as a Jehovah's Witness were disingenuous, and (3) this Court should thus remand for a de novo hearing. She further asserts that her objection was sufficiently specific in challenging the referee's conclusions on TM's established custodial environment and the applicable burden of proof, the existence of proper cause or a change in circumstances to warrant modification of custody, and whether such a modification was in TM's best interests. Her

objection also specifically cited *Dailey* as rendering joint legal custody inappropriate under the instant circumstances. Even so, plaintiff acknowledges that she "did not have access to the transcripts in time to summarize them before filing her objection."

MCR 3.215(F)(2) governs the conduct of the judicial hearing following a party's objection to an FOC recommendation as follows:

> To the extent allowed by law, the court may conduct the judicial hearing by review of the record of the referee hearing, but the court must allow the parties to present live evidence at the judicial hearing. The court may, in its discretion:
>
> (a) prohibit a party from presenting evidence on findings of fact to which no objection was filed;
>
> (b) determine that the referee's finding was conclusive as to a fact to which no objection was filed;
>
> (c) prohibit a party from introducing new evidence or calling new witnesses unless there is an adequate showing that the evidence was not available at the referee hearing;
>
> (d) impose any other reasonable restrictions and conditions to conserve the resources of the parties and the court.

MCL 552.507 also permits judicial review of FOC recommendations following the objection of a party. In relevant part, it reads:

> (5) A hearing is de novo despite the court's imposition of reasonable restrictions and conditions to conserve the resources of the parties and the court if the following conditions are met:
>
> (a) The parties have been given a full opportunity to present and preserve important evidence at the referee hearing.
>
> (b) For findings of fact to which the parties have objected, the parties are afforded a new opportunity to offer the same evidence to the court as was presented to the referee and to supplement that evidence with evidence that could not have been presented to the referee.
>
> (6) Subject to subsection (5), de novo hearings include, but are not limited to, the following:
>
> (a) A new decision based entirely on the record of a previous hearing, including any memoranda, recommendations, or proposed orders by the referee.
>
> (b) A new decision based only on evidence presented at the time of the de novo hearing.

(c) A new decision based in part on the record of a referee hearing supplemented by evidence that was not introduced at a previous hearing.

Interpreting the statutory provision and the court rule, this Court in *Dumm v Brodbeck*, 276 Mich App 460; 740 NW2d 751 (2007), affirmed the trial court's custody determination even though it refused to hold a full-blown evidentiary hearing after the defendant objected to the referee's recommendation. *Id*. at 463-466. The *Dumm* Court concluded that it was proper for the trial court to reject the defendant's objection without an evidentiary hearing because (1) it adequately considered the prior FOC record, (2) the defendant, in objecting to the referee recommendation, neither requested to present live testimony nor provided any additional supporting documentary evidence, and (3) nothing indicated that the defendant was prevented from presenting any evidence before the FOC referee. *Id*. at 464-466. Relatedly, in a brief opinion reversing this Court's ruling that the trial court failed to conduct an evidentiary hearing on a party's objection to an arbitrator's custody determination, the Michigan Supreme Court held that "as long as the circuit court is able to determine independently what custodial placement is in the best interests of the children[,] . . . an evidentiary hearing is not required in all cases." *MacIntyre v MacIntyre*, 472 Mich 882, 882; 693 NW2d 822 (2005) (quotation marks and citation omitted).

First and foremost, we agree with the trial court that plaintiff's objection failed to comply with MCR 3.215(E)(4). Though plaintiff did superficially object to the referee's conclusions on TM's established custodial environment and the applicable burden of proof, the existence of proper cause or a change in circumstances to warrant modification of custody, and whether such a modification was in TM's best interests, she did not state with specificity what was inaccurate or incomplete in the referee's recommendation regarding these alleged errors. Instead, plaintiff simply reasserted basically the same arguments made before the referee. Additionally, she did not identify any facts improperly considered or omitted by the referee, and she did not present any new evidence or assert that any evidence had been restricted during the earlier evidentiary hearing.

And, following *Dumm*, we conclude that the trial court needed not hold a second evidentiary hearing even if plaintiff's objection was facially valid. Like the defendant in *Dumm*, plaintiff never requested to present any additional testimony with her objection and it similarly lacked supporting documentary evidence. See *Dumm*, 276 Mich App at 465-466 ("[the] defendant neither asked to present live evidence before the trial court nor presented any documentation or affidavits to support his allegations."). Nor is there any indication in the record or in plaintiff's arguments that she was prevented from presenting any evidence before the referee. These deficiencies also refute plaintiff's contention on appeal that she would have been able to provide additional evidence to establish defendant's promises to support TM's religion as a Jehovah's Witness were disingenuous. And she still does not describe with any specificity her allegedly available additional evidence. Lastly, though it did not say so explicitly, the trial court implied at the objection hearing that it had reviewed the FOC record.

For these reasons, the February 2022 hearing on plaintiff's objection satisfied the requirements of MCL 522.507 and MCR 3.215(E) and (F) regarding a de novo hearing. Therefore, the trial court did not abuse its discretion in denying plaintiff's objection without holding an evidentiary hearing.

Affirmed.

/s/ Michael J. Riordan
/s/ Stephen L. Borrello
/s/ Anica Letica